**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **MONICA JOHNSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **CIVIL ACTION 13-0431-WS-M** |
| | ) |
| **MOBILE INFIRMARY MEDICAL** | ) |
| **CENTER,** | ) |
| | ) |
| **Defendant.** | ) |

**ORDER**

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 42). The Motion has been briefed and is now ripe for disposition. Also pending is defendant's Motion to Strike (doc. 63).[1]

**I.     Nature of the Action.**

Plaintiff, Monica Johnson, is an African-American female and a member of the Seventh Day Adventist Church. Johnson brought this action against her employer, Mobile Infirmary Medical Center, alleging violations of various federal statutes arising from a scheduling fracas

---

[1]     Both sides have made this Court's task on summary judgment review more onerous than necessary by not adhering to relevant rules and orders. For example, defendant's brief improperly features 1.5 spacing (as compared to its Motion for Summary Judgment and Motion to Strike, which are properly double-spaced) and microscopic footnotes. The Local Rules require filings to be double-spaced and to use fonts of 12-point type or larger for all text, including footnotes. *See* LR 5.1(a). Defendant has also failed to comply with the Scheduling Order requirement that "[i]f a party's exhibits in support of or in opposition to a motion exceed 50 pages in the aggregate, then that party must deliver a courtesy hard copy of those exhibits to the Judge's chambers by mail or hand delivery." (Doc. 39, ¶ 13(c).) Similarly, plaintiff's brief exceeds the 30-page limit without leave of court, in violation of Local Rule 7.1(b), and omits page numbers as well as pinpoint citations to the portions of the record that she contends support her iteration of the facts. *See* Rule 56(c)(1)(A), Fed.R.Civ.P. ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … ***citing to particular parts of materials in the record***.") (emphasis added). In its discretion, the Court will consider the parties' filings notwithstanding these and other technical defects.

that occurred in January 2013.  In Count I of the Second Amended Complaint (doc. 32), Johnson alleges that Mobile Infirmary scheduled her to work in a manner that conflicted with her religious beliefs, in violation of Title VII of the Civil Rights Act of 1964, as amended.  Count II alleges that Mobile Infirmary discriminated against Johnson based on her race, in violation of Title VII and 42 U.S.C. § 1981, "[b]y forcing Plaintiff to make up miss [*sic*] work days and not require [*sic*] the same of white employees who miss their regularly scheduled work days."  (Doc. 32, ¶ 31.)  In Count III, Johnson asserts that Mobile Infirmary violated the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), "[b]y forcing Plaintiff to work her regular shift when she sought time off to care for a seriously ill minor child."  (Doc. 32, ¶ 32.)  The final two causes of action sound in theories of retaliation.  Specifically, in Count IV, Johnson maintains that Mobile Infirmary violated the FMLA's anti-retaliation provisions by failing to allow her to take leave and then taking "punitive action against her due to her complaints."  (*Id.*, ¶ 33.)  Finally, Count V alleges that Mobile Infirmary unlawfully retaliated against Johnson, in violation of Title VII and § 1981, for complaining about the way her supervisor was treating her.  Defendant now moves for summary judgment as to all causes of action.

## II.    Motion to Strike.

Before proceeding any further, the Court pauses to address defendant's Motion to Strike (doc. 63), and plaintiff's Response (doc. 64) to same.[2]  On summary judgment, record facts and factual inferences must be construed in the light most favorable to the nonmoving party.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11ᵗʰ Cir. 2007).  Thus, Johnson's evidence is taken as true and all justifiable inferences are drawn in her favor.  In its Motion to Strike, however, Mobile Infirmary requests that portions of the record (including certain facts on which Johnson relies) be stricken.  The contours of the summary judgment record – and, hence, the factual backdrop against which the Rule 56 Motion is measured – cannot be discerned without first adjudicating the Motion to Strike.  There are five discrete components to that Motion, each of which will be addressed in turn.  The net result is that the Motion to Strike is **denied**.

---

[2]    In many respects, plaintiff's Response to the Motion to Strike – which was submitted after summary judgment briefing closed – reads like an unauthorized sur-reply in opposition to the Motion for Summary Judgment.  Although such filings are disfavored, the Court in its discretion will accept plaintiff's submission and will consider the arguments therein as they relate to summary judgment issues beyond the confines of the Motion to Strike.

First, Mobile Infirmary objects to Johnson's use of exhibits (including screen shots, policy documents, medical reports and the like) that have not been authenticated.  This objection is **overruled**.  Whether these exhibits are presently in admissible form is of no consequence.  *See* Rule 56(c)(2), Fed.R.Civ.P. ("A party may object that the material cited to support or dispute a fact ***cannot be presented in a form*** that would be admissible in evidence.") (emphasis added).  It is well settled that exhibits are properly considered for summary judgment purposes as long as they may be reduced to admissible form at trial.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) ("a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form").[3] Mobile Infirmary does not suggest that these exhibits are incapable of being reduced to admissible form at trial; therefore, the "lack of authentication" argument fails.

Second, Mobile Infirmary asks that certain statements in plaintiff's declaration attributed to Faith Lawshe be stricken as hearsay.  In particular, the Johnson Declaration recounts Lawshe's purported remarks on May 31, 2013 about her husband's medical condition, her reasons for visiting the nursing unit when she was off work, and the like.  (Johnson Decl. (doc. 59), at 11.) In its Motion to Strike, Mobile Infirmary observes, "It is unclear what relevance this encounter has to any aspect of the case at hand."  (Doc. 63, at 5.)  The Court agrees.  Inclusion or exclusion of the portion of Johnson's Declaration reciting Lawshe's statements of May 31, 2013 would have no perceptible impact on the summary judgment analysis; therefore, the Court does not reach this objection.  The Motion to Strike is **moot** as to the Lawshe statements.

Third, Mobile Infirmary interposes a hearsay objection to plaintiff's Exhibit B, a six-line handwritten document purportedly prepared by Phuong Ly on January 15, 2013.  (*See* Doc. 57,

---

[3]       *See also Longcrier v. HL-A Co.*, 595 F. Supp.2d 1218, 1223 (S.D. Ala. 2008) ("The general rule in this Circuit is that parties' exhibits may be considered for purposes of pretrial rulings so long as they can be reduced to admissible form at trial.") (citations omitted); *Prince Hotel, S.A. v. Blake Marine Group*, 2012 WL 4711897, *1 n.5 (S.D. Ala. Oct. 2, 2012) ("Even unauthenticated or otherwise inadmissible evidence is properly considered on summary judgment so long as it can be reduced to admissible form at trial.").

Exh. B.)  This exhibit relates to an incident in which Ly came into work for Johnson, but was immediately sent home because there were already six nurses on duty.  Defendant asserts that this exhibit and references to same in Johnson's brief must be stricken as hearsay.  However, Mobile Infirmary does not argue that this statement is incapable of being presented in admissible form at trial, and Johnson shows that it can indeed be reduced to admissible form.  As such, Exhibit B is properly considered on summary judgment and defendant's objection is **overruled**. *See, e.g., Jones*, 683 F.3d at 1293-94 ("a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form") (citation omitted); *Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1135 (11th Cir. 1996) ("[i]t is true that inadmissable hearsay may sometimes be considered by a court when ruling on a summary judgment motion," where such evidence is "reducible to admissible form at trial").

Fourth, Mobile Infirmary's Motion to Strike takes aim at portions of Johnson's Declaration specifying the time and attendance records of Jason Thompson, Faith Lawshe and Diana Kennedy in painstaking detail by listing specific dates, clock-in times and notations on time sheets.  (Johnson Dec., at 10, 12.)  Mobile Infirmary insists that "there is no legitimate way that Johnson has knowledge of such comprehensive employment attendance records."  (Doc. 63, at 6.)  In a supplemental declaration, however, Johnson explains this mystery and demonstrates her personal knowledge of this information because (i) Mobile Infirmary publicly posts work schedules for RNs in the unit; (ii) when a nurse comes in late or fails to report to work, supervisors make notations on those publicly posted schedules; (iii) Johnson examined and made notes from these business records on an ongoing basis to track the attendance histories of her co-workers; and (iv) Johnson also personally observed and recorded the attendance shortcomings of these individuals.  (Johnson Decl. II (doc. 64-1), ¶¶ 5-6, 12.)

On the strength of this showing, the Court is satisfied that Johnson has demonstrated a basis for personal knowledge for her detailed averments about the alleged time and attendance violations of Thompson, Lawshe and Kennedy.  Accordingly, this evidence comports with the Federal Rules of Civil Procedure's mandate that a summary judgment declaration "must be made on personal knowledge … and show that the affiant or declarant is competent to testify on the

matters stated." Rule 56(c)(4), Fed.R.Civ.P.[4]  As to the portions of the Johnson Declaration identifying the time and attendance histories of Thompson, Lawshe and Kennedy, then, the Motion to Strike is **denied**.

Fifth, Mobile Infirmary contends that two statements in the Johnson Declaration concerning her supervisor, Stefanie Willis-Turner, should be stricken as "inadmissible hearsay and … conclusory statements made without personal knowledge." (Doc. 63, at 7.)  In particular, defendant objects to the portion of the Johnson Declaration recounting conversations in which she told Willis-Turner that she (Johnson) could not work from Friday sundown to Saturday sundown because of her religious observances.  Defendant also objects to the portion of the Johnson Declaration reflecting that Willis-Turner advised her that light duty was not available. Mobile Infirmary's hearsay and personal knowledge objections to these statements are unfounded.  What Johnson may have informed Willis-Turner about her religious observances is not hearsay because it would not be offered for the truth of the matter asserted, but rather to show that the words were spoken to Willis-Turner.  And Willis-Turner's statements appear to fit comfortably within the boundaries of Rule 801(d)(2)(D), Fed.R.Evid.  The Motion to Strike is **denied** as to these portions of the Johnson Declaration.

## III.  Relevant Factual Background.[5]

---

[4]  To be sure, plaintiff's evidence invites Mobile Infirmary to assert a follow-up objection that Johnson's parroting in her Declaration of data she copied from defendant's business records constitutes hearsay.  Had it been articulated, such an objection would not be fatal to consideration of this information at the summary judgment stage because (i) Johnson stated that she often personally observed these time and attendance violations, and (ii) any hearsay problem as to attendance records could be resolved at trial by introducing the business records or through examination of Willis-Turner or other Mobile Infirmary supervisors, such that (iii) defendant has not shown that the challenged information could not be reduced to admissible form at trial.

[5]  The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop*, 485 F.3d at 1136.  Thus, Johnson's evidence is taken as true and all justifiable inferences are drawn in her favor.  Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.").  Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but (Continued)

Monica Johnson has worked for Mobile Infirmary Medical Center as a Registered Nurse in the Telemetry Unit since 2002. (Johnson Decl., at 1.) At the outset of her employment, Johnson notified Mobile Infirmary of her status as a Seventh Day Adventist and her resulting unavailability between the hours of sunset on Friday evenings and sunset on Saturday evenings in observance of her Sabbath. (*Id.*) By all appearances, Mobile Infirmary successfully accommodated Johnson's religious beliefs for many years by not scheduling her to work during her Sabbath observances.

> ### A.   *History of Working Relationship between Plaintiff and Supervisor.*

In July 2012, Stefanie Willis-Turner became the RN Manager of the Telemetry/Oncology Unit, with Johnson being one of her subordinates. (Willis-Turner Aff. (doc. 42-2), ¶ 3.) At that time, Mobile Infirmary classified Johnson as a regular part-time registered nurse, and regularly scheduled her to work two 12-hour shifts per week, for a total of 48 hours per two-week pay period. (Stembridge Aff. (doc. 42-1), ¶ 3.) In August 2012, Johnson notified Willis-Turner of her Seventh Day Adventist status, and explained that she could not work on Fridays after sundown, or on Saturdays prior to sunset. (Johnson Decl., at 2.) On multiple occasions thereafter, Johnson reminded Willis-Turner that she was unavailable for work on Friday evenings and Saturdays because of her religious observances. (*Id.*)[6] Willis-Turner accommodated Johnson's religion-based work restrictions for six months without incident. (*Id.* at 7.)

The working relationship between Johnson and Willis-Turner soured late in 2012 when Willis-Turner imposed discipline for time and attendance infractions. On December 26, 2012, Willis-Turner issued a written warning to Johnson in a Corrective Action Report, indicating as follows: "Employee has failed to comply with the current time and attendance guidelines as

_____

instead accept[s] [Johnson's] version of the facts drawing all justifiable inferences in [her] favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

[6]      On summary judgment, defendant submits an Affidavit from Willis-Turner, wherein she disclaims knowledge of Johnson's religious scheduling conflict until January 30, 2013. (Willis-Turner Aff., ¶¶ 12-13.) Because the record must be viewed in the light most favorable to the non-movant, and because plaintiff's evidence is contrary to the Willis-Turner Affidavit, defendant's evidence on this point cannot be credited for summary judgment purposes.

established.  She has a total of 5 occurrences at this time.  Employee is expected to continue to improve and comply with current guidelines."  (Willis-Turner Aff., ¶ 3 & Exh. A.)  This Report notes that Johnson had previously received oral warnings for violations of time and attendance guidelines in January 2011 and February 2009.  (*Id.*)  Just five days later, on December 31, 2012, Willis-Turner counseled Johnson in the presence of Mike Rauch, Nursing Director, for her "overall attitude and behavior" in the wake of the December 26 corrective action.  (*Id.*, ¶ 3 & Exh. C.)  On the write-up for this counseling session, Johnson added the notations "not true" and "not in agreement."  (*Id.*)

### B.    Scheduling Issues During the Week of January 6-11, 2013.

Against this backdrop of what appears to have been a deteriorating work relationship between Johnson and Willis-Turner, Johnson's six-year old son fell ill on Saturday, January 5, 2013.  Johnson called Willis-Turner on January 5 to report that she would be unable to work her scheduled shift on Sunday, January 6, and that she would take her son to the doctor.  (Johnson Decl., at 3.)  Johnson in fact appeared for work on January 6, but left early (apparently with the Charge Nurse's permission) at 2:00 p.m. to attend to her sick child.  (Willis-Turner Aff., ¶¶ 6-7.)  Johnson then took her son to the American Family Care clinic in Saraland, where he was diagnosed with influenza, prescribed Tamiflu to take by mouth twice per day for five days, and cleared to return to school on Wednesday, January 9.  (Johnson Decl., at 3; doc. 57, Exh. D.)[7]  Johnson had been scheduled to work on Monday, January 7 and Tuesday, January 8; however, in light of this doctor's report, she contacted Willis-Turner and indicated that she would miss both shifts.  (Willis-Turner Aff., ¶ 7.)  Willis-Turner adjusted the work schedule by assigning other nurses to fill Johnson's January 7 and 8 shifts, and rescheduling Johnson to work those nurses' shifts on Thursday, January 10 and Friday, January 11.  (*Id.*, ¶ 8.)

Upon learning of this schedule modification on January 7, Johnson notified Willis-Turner that she could work on Tuesday, January 8, after all, but that she was unable to work on the evening of Friday, January 11, because of her religious beliefs.  (Johnson Decl., at 3-4.)  Willis-Turner refused to alter the schedule, saying that it would be inconvenient to adjust the schedule a

---

[7]    Johnson furnished Willis-Turner with documentation from her son's treating physician, confirming both the doctor's visit and the diagnosis.  (Johnson Decl., at 5.)

second time. (*Id.*)[8]  Johnson arrived for work approximately 90 minutes late on both Thursday, January 10 and Friday, January 11, explaining that no one else was available to take her child to school on those days. (*Id.* at 4; Willis-Turner Aff., ¶ 9.)  Then, on Friday morning, Johnson received two telephone calls from her child's school, advising that Johnson's son was vomiting and requesting that she pick him up. (Johnson Decl., at 5.)  When Johnson apprised Willis-Turner of the situation and her need to take her son back to the doctor's office because no one else was available to do so, Willis-Turner responded that if Johnson left, she would receive a final written warning and would be suspended for two shifts. (*Id.*; Willis-Turner Aff., ¶ 10 & Exh. G.)  Johnson indeed left her shift at approximately 1:00 p.m. on Friday, January 11, picked up her son and took him back to the Saraland clinic, where a doctor confirmed that he still had the flu, administered an injection of Promethazine, directed Johnson's son to continue taking Tamiflu, and cleared the child to return to school on January 14. (Doc. 57, Exh. D.)  Johnson submitted these medical records to Willis-Turner the following week. (Johnson Decl., at 5.)

In her Declaration, Johnson explains why she did not return to work the evening portion of her shift on January 11 after taking her son home from his doctor's visit. (Johnson Decl., at 9.)  She did not do so because, by this time, Friday sundown was nigh or had already arrived; therefore, it was Johnson's Sabbath and her religious beliefs precluded her from working. (*Id.*)  Johnson's testimony is that she would not have worked her full shift through the evening of Friday, January 11, even if her son had not become ill that morning, because her religious practices forbade her from doing so. (*Id.* at 8-9.)

Johnson's next scheduled shift was on Wednesday, January 16.  When she returned to work that day, Willis-Turner presented Johnson with a written Corrective Action Report dated January 14, 2013, specifying that "[e]mployee has continued to violate the time and attendance policy.  Since last corrective action, she has further accrued 1 call in, tardies, and suspension.

---

[8]    Plaintiff's evidence is that this explanation was disingenuous.  One of the affected nurses was Phuong Ly, whose work schedule had been shifted from Friday, January 11 to Tuesday, January 8 in order to cover Johnson's absence.  When Ly arrived for work on January 8, however, Willis-Turner sent her home because there were already enough nurses on duty, and instructed her to come back on Thursday, January 10, not Friday, January 11. (Doc. 57, Exh. B.)  The implication from this evidence is that Willis-Turner could have easily juggled the schedule to place Ly back on a Friday, January 11 shift, thereby freeing up Johnson to honor her Sabbath observance beginning at sundown on Friday; however, Willis-Turner elected not to do so.

This shows lack of integrity and core values." (Willis-Turner Aff., ¶ 11 & Exh. H.)  The result of this Report was that Johnson received a "Final Warning" along with a suspension to last two 12-hour shifts.  (*Id.*)  Johnson signed the Corrective Action Report, but added the notation, "not in agreement with Stephanie's report."  (*Id.*)

Johnson had submitted medical records documenting her six year-old son's doctor's visits on January 6 and January 11, as well as the flu diagnosis and accompanying notes excusing him from returning to school until January 14.  At the time, however, Johnson did not notify Willis-Turner or any other Mobile Infirmary official that she wished for her absences to be protected as FMLA leave.  (Johnson Decl., at 5; Willis-Turner Aff., ¶ 11.)  Several months later, after Johnson raised the FMLA issue, Randy Stembridge, defendant's Director of Employee Relations, met with Johnson, "encouraged her to submit additional information … to show it was an FMLA qualifying situation," and offered to reimburse her for the suspension and expunge the suspension from her record if she did so.  (Stembridge Aff., ¶ 6.)  Johnson did not avail herself of this opportunity because she had already submitted all medical records she had, and Mobile Infirmary did not specify what additional information or documentation was needed to process her claim for FMLA coverage.  (Johnson Decl., at 14.)

### C.     Post-Suspension Issues as to Accommodation, Scheduling and Light Duty.

In late January 2013, Willis-Turner instituted a new policy that regular part-time registered nurses (such as Johnson) must work one weekend per month.  (Willis-Turner Aff., ¶ 12.)  This policy was irreconcilable with Johnson's religious requirement that she not work on her Sabbath.  On January 29, 2013, Johnson submitted a typewritten letter to Willis-Turner and other Mobile Infirmary officials identifying her Seventh Day Adventist faith, explaining that it would violate her "deeply held, sincere religious convictions to work on the Sabbath, which begins at sundown Friday night and ends at sundown Saturday," and requesting that the accommodation she had been granted for the last 10.5 years be continued and that she not be scheduled to work on her Sabbath.  (*Id.*, ¶ 13 & Exh. K.)[9]  After a few weeks of discussions between Johnson and Mobile Infirmary, during which time she was not assigned to work on her

---

[9]     Johnson avers that the January 29 letter was a direct response to Willis-Turner's attempt to force her to work a full 12-hour shift on Friday, January 11, despite Johnson's repeated statements to Willis-Turner that her religious beliefs forbade her from working after sunset on Fridays.  (Johnson Decl., at 6.)  The letter made no reference to that incident.

Sabbath, Mobile Infirmary agreed to an accommodation pursuant to which Johnson "will complete her necessary weekend rotation(s) requirement by working additional Sunday's [*sic*] in place of the afore mentioned [*sic*] hours related to her Sabbath." (*Id.*, ¶ 13 & Exh. N.) This accommodation remains in effect today. At no time since February 2013 has Johnson been required to work a Friday or Saturday shift. (Stembridge Aff., ¶¶ 4-5.)

After submitting the January 29 letter and obtaining the specified accommodation to her religious beliefs, Johnson maintains, "my work hours was cut." (Johnson Decl., at 6.) Plaintiff provides no factual elaboration. The record facts concerning Johnson's work hours prior to and following her January 2013 request for religious accommodations are these: As a regular part-time RN, Johnson was regularly scheduled to work two 12-hour shifts per week, or 48 hours per two-week pay period. (Stembridge Aff., ¶ 3.) Johnson and other part-time RNs could volunteer to pick up additional shifts from time to time as needed. (Willis-Turner Aff., ¶ 14.) Had Johnson only worked her regular 48 hours per pay period, she would accrue 1,248 hours per year (48 hours x 26 pay periods). In fact, however, Mobile Infirmary payroll records demonstrate that Johnson worked 1,680.80 hours in 2013. (Stembridge Aff., ¶ 9 & Exh. K.) By way of example, for the May 31, 2013 payday, Johnson was paid for 101.40 hours. (*Id.*) On the June 28, 2013 payday, she was paid for 82.40 hours. (*Id.*) The records confirm that there was not a single 2013 pay period in which Johnson was paid for fewer than 48 hours, except for the period ending January 25, 2013, which would cover her two-shift suspension. Moreover, in December 2013, Mobile Infirmary transferred Johnson from a part-time position to a full-time position in the same department, after which she was regularly scheduled for at least 72 hours per pay period. (Stembridge Aff., ¶ 10 & Exh. L.)

In addition to alleging a reduction in work hours after the January 29 request for religious accommodation, Johnson contends that she "was denied light duty work following an on the job injury in retaliation for pushing the issue regarding [her] religious convictions." (Johnson Decl., at 6.) Johnson injured her wrist in late January 2014 when she slipped on ice in the Mobile Infirmary parking lot. (Hybart Aff. (doc. 62, Exh. A), ¶ 2.) Johnson contends that she was off from work on a worker's compensation leave of absence from March 2014 until August 2014, when she returned to work in a full-time capacity. (Johnson Decl., at 6.) Johnson further maintains that her physician released her for light duty prior to August, but that Willis-Turner

refused to provide light-duty assignments on the stated ground that "no such work was available."  (*Id.*)

Johnson provides no documentation in support of these "facts," many of which are squarely refuted by Mobile Infirmary records.  Those documents reflect that the only time Johnson's medical providers released her to light-duty work was in mid-February 2014, when she returned to work for two days with a 20-lb. lifting restriction before leaving because she was in too much pain.  (Hybert Aff., ¶¶ 3, 5, 7; Willis-Turner Aff. II (doc. 62, Exh. C), ¶ 2.)  After that failed attempt to return to work with a lifting restriction, Johnson presented no documentation or information to Willis-Turner seeking to return to work with or without restrictions until late May 2014.  (Willis-Turner Aff. II, ¶ 2.)  Johnson's treating physician discharged and released her to "[f]ull duty at work" effective May 27, 2014.  (Hybert Aff., ¶ 3 & Exh. A.)[10]  On June 24, 2014, an independent medical examination (performed at Johnson's request) concluded that Johnson had no work restrictions from the January injury.  (*Id.*, ¶ 4 & Exh. C.)[11]  At that time, Mobile Infirmary placed Johnson back on the schedule in full-duty status.  (*Id.*, ¶ 4.)  Johnson remains employed as an RN in defendant's Telemetry unit today.  (Johnson Decl. II (doc. 64-1), ¶ 1.)

**IV.    Analysis.**

   ***A.    Summary Judgment Standard.***

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule

---

[10]    The May 27 report prepared by Dr. Bose is noteworthy in several other respects. First, the report documents Johnson's statement that "she has not improved at all" since the January 2014 accident.  (*Id.*)  Second, Dr. Bose indicates that Johnson had attended only 4 of 9 scheduled physical therapy visits, with the physical therapist documenting "multiple inconsistencies in the patient's complaints and effort."  (*Id.*)  Third, Dr. Bose stated his conclusion that Johnson was being "non-cooperative and trying to exaggerate her weakness" upon reexamination, and that he "cannot find any evidence to substantiate the patients [*sic*] complaints of pain."  (*Id.*)  Fourth, Dr. Bose observed that his relationship with Johnson had become "adversarial" and that he was going to discharge her from the clinic.  (*Id.*)

[11]    The report from the independent medical examination prepared by Dr. Saiter was markedly similar to Dr. Bose's May 27 report, inasmuch as Dr. Saiter observed a "lack of objective findings, marked inconsistencies on physical examination and excessive subjective complaints in the absence of objective physical findings."  (*Id.*)

56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted); *see also Williamson v. Clarke County Dep't of Human Resources*, 834 F. Supp.2d 1310, 1318 (S.D. Ala. 2011) (recognizing and applying rule that summary judgment standard is applied equally in employment discrimination cases as in other kinds of federal actions).

### B.    *Burden-Shifting* McDonnell Douglas Framework.

The parties are in agreement that, as to all claims except the FMLA interference cause of action, Johnson must make a showing of circumstantial evidence that satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[12]

---

[12]    Although plaintiff's claims are nominally brought under Title VII, 42 U.S.C. § 1981, and FMLA's anti-retaliation provision, both sides properly recognize that the applicable legal standard is identical for each (doc. 43, at 7, 10-11, 13, 20; doc. 56, at 15, 20-21, 30). *See, e.g., Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1174 n.6 (11th Cir. 2010) ("The (Continued)

Under this familiar burden-shifting analysis, plaintiff is required to make out a *prima facie* case of unlawful discrimination or retaliation.  If she does so, that showing "creates a rebuttable presumption that the employer acted illegally." *Underwood v. Perry County Com'n*, 431 F.3d 788, 794 (11th Cir. 2005).  At that point, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. ... If the employer does this, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination." *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (citations and internal quotation marks omitted); *see also Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (outlining similar procedure for Title VII retaliation claims).  A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007).

## C.    *Religious Discrimination Claim (Count I).*

In Count I of the Second Amended Complaint, Johnson alleges that Mobile Infirmary violated Title VII of the Civil Rights Act of 1964 by failing to accommodate her religious beliefs and "forcing Plaintiff to work on her Sabbath under penalty of suspension."  (Doc. 32, ¶ 30.)  By its terms, Title VII requires an employer to accommodate "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate … [an] employee's religious observance or practice without undue hardship …."

---

analysis under [§ 1981] claims mirrors that under Title VII."); *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791 (11th Cir. 2000) ("When evaluating a claim of retaliation under the FMLA, in the absence of direct evidence of discrimination on the part of the employer, we apply the burden-shifting framework established by the Supreme Court in *McDonnell Douglas* … for evaluating Title VII retaliatory discharge claims."); *Brown v. School Bd. of Orange County, Florida*, 459 Fed.Appx. 817, 819 (11th Cir. Feb. 28, 2012) ("Title VII and § 1981 have the same requirements of proof and utilize the same analytical framework.").  The parties have not argued that the analysis differs for any of the various species of claims that Johnson is asserting, save her FMLA interference cause of action, which will be addressed separately because that claim does not require proof of intentional discrimination.

42 U.S.C. § 2000e(j); *see also Beadle v. Hillsborough County Sheriff's Dep't*, 29 F.3d 589, 593 (11th Cir. 1994) ("we recognize an employer's duty to reasonably accommodate the religious practices of its employee"). Thus, an employer has a "statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship." *Walden v. Centers for Disease Control and Prevention*, 669 F.3d 1277, 1293 (11th Cir. 2012) (citation and internal quotation marks omitted). Defendant's Rule 56 Motion as to Count I challenges the sufficiency of Johnson's *prima facie* showing.

To make out a *prima facie* case of failure to accommodate religious beliefs, a plaintiff must demonstrate that (1) she "held a *bona fide* religious belief that conflicted with an employment requirement;" (2) she informed the employer of that belief; and (3) she was disciplined "for failing to comply with the conflicting employment requirement." *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 855 (11th Cir. 2010); *see also Walden*, 669 F.3d at 1293 (similar). As to the first element, there is no dispute that Johnson's *bona fide* religious beliefs precluded her from working after sundown on Friday evenings, and that this religious observance conflicted with Mobile Infirmary's requirement that she work a 12-hour shift on Friday, January 11, 2013, which would have extended well past sunset.

With regard to the second prong, Mobile Infirmary maintains that Johnson never informed Willis-Turner of the religious conflict with her January 11 work schedule. The record in the light most favorable to plaintiff shows otherwise. Indeed, plaintiff's evidence (which must be accepted as true on summary judgment) shows that Johnson repeatedly informed Willis-Turner of her religious status and concomitant inability to work between Friday sunset and Saturday sunset. According to plaintiff's evidence, Johnson first notified Willis-Turner of her need for accommodation in this regard back in August 2012, shortly after Willis-Turner became her supervisor, and reiterated her need for such accommodation on multiple occasions thereafter, including on January 7, specifically with respect to the January 11 shift; however, Willis-Turner refused to adjust the schedule. Again, that evidence is credited for purposes of the Rule 56 analysis, and plainly establishes the second element of Johnson's *prima facie* case.

The third element of the *prima facie* case is where Johnson's claim of failure to provide religious accommodation falls apart. That element requires Johnson to show that she "was disciplined for failing to comply with the conflicting employment requirement." *Dixon v. Palm Beach County Parks and Recreation Dept.*, 343 Fed.Appx. 500, 502 (11th Cir. Aug. 31, 2009).

Plaintiff's evidence is that she reported to work on the morning of Friday, January 11, for her scheduled shift.  At approximately 12:30 p.m. that day, Johnson notified Willis-Turner that she had to leave work to tale her sick child to the doctor.  Johnson did <u>not</u> tell Willis-Turner that she was leaving to honor her Sabbath observance, nor would such an announcement have been accurate, given that sunset was still several hours away.  In response, Willis-Turner notified Johnson that, in plaintiff's words, "if I left my shift I would receive a final written warning and a suspension for two shifts."  (Johnson Decl., at 5; *see also* Willis Turner Aff., ¶ 10 & Exh. G.)  Johnson left at approximately 12:55 p.m., for which she received a final written warning and suspension.  These facts – which are taken in the late most favorable to Johnson – unequivocally show that Mobile Infirmary disciplined her for leaving work early in the afternoon to pick up a sick child from school, not for refusing to work after sundown that night because of her religious beliefs.  No reasonable inference may be drawn from these facts that Johnson was disciplined for failing to comply with an employment requirement that conflicted with her *bona fide* religious beliefs; therefore, no *prima facie* case of failure to provide religious accommodation has been made.  Mobile Infirmary is entitled to dismissal of Count I.[13]

### D.      Race Discrimination Claim (Count II).

In Count II of her Second Amended Complaint, Johnson alleges that Mobile Infirmary discriminated against her on the basis of her race (black) in violation of Title VII and § 1981, by "forcing Plaintiff to make up miss[ed] work days and not requir[ing] the same of white employees who miss their regularly scheduled work days."  (Doc. 32, ¶ 31.)  Once again, Mobile

---

[13]      In so ruling, the Court rejects Johnson's argument that mere serendipity prevented her religious conflict from coming to a head during her scheduled January 11 shift.  Plaintiff explains that, while she reported to work that morning, she "could not and would not stay for Friday evening due to religious concerns," but "[i]t just so happened that the school called" about her ailing son before the religious conflict ever materialized.  (Doc. 56, at 19.)  Even if Johnson is correct that she would have walked off the job before sunset to honor her religious beliefs, the undisputed fact is that it did not happen because she had already left work earlier that day for other reasons.  Plaintiff's own evidence confirms that Mobile Infirmary disciplined Johnson for leaving work at approximately 1:00 p.m. on January 11 to pick up a sick child, not because she hypothetically would have left work several hours later because of her religion and not because she failed to return to work later in the day.  The point is simple:  Plaintiff has not drawn any factual nexus or causal inference between the discipline she received for leaving work early on January 11 and her Seventh Day Adventist religious observances.  As such, she has not made out a *prima facie* case of failure to accommodate her religious beliefs.

Infirmary focuses its summary judgment arguments on Johnson's purported inability to establish a *prima facie* case as to Count II.

The parties concur that Johnson's *prima facie* showing as to Count II must demonstrate each of the following: (i) she belongs to a protected class; (ii) she was qualified to do the job; (iii) she was subjected to an adverse employment action; and (iv) the employer treated similarly situated employees outside her protected class more favorably.  (*See* doc. 43, at 11; doc. 56, at 21.)[14]  Mobile Infirmary seizes on the "similarly situated comparator" prong, reasoning that Johnson has failed to "identify a proper comparator," as needed to demonstrate that defendant "treated similarly situated employees outside her protected class more favorably."  (Doc. 43, at 11.)  In the work rules / discipline context, the Eleventh Circuit has adopted a demanding test that the comparator be "similarly situated to the plaintiff in all relevant respects" and that the "quantity and quality of the comparator's misconduct must be nearly identical."  *Stone & Webster Const., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012) (citations omitted).  "We ask whether the comparator is involved in the same or similar conduct as the plaintiff yet disciplined in a different way."  *Id.*[15]

Johnson identifies three Caucasian RNs at Mobile Infirmary whom she claims engaged in similar violations of the company's time and attendance policies, yet were either not disciplined as severely as Johnson was, or not forced to make up their time as Johnson was.  The first alleged comparator, Diana Kennedy, is properly disqualified because irrefutable evidence submitted by defendant establishes that she is African-American.[16]  It is, of course, an irreducible

---

[14]     Eleventh Circuit authority supports this formulation of the relevant standard.  *See, e.g., Crawford*, 529 F.3d at 970 ("To make out a *prima facie* case of racial discrimination a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably."); *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008) (similar).

[15]     The purpose of this stringent "nearly identical" requirement is "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (citations omitted).

[16]     To be sure, Johnson's narrative identifies Kennedy as Caucasian.  (Johnson Decl., at 9.)  Not only does Willis-Turner describe Kennedy as African-American, but she also submits a photograph of Kennedy from Mobile Infirmary's intranet site that unequivocally reveals her to be African-American.  (Willis-Turner Aff. II, ¶ 5 & Exh. B.)  On this record, no reasonable jury (Continued)

-16-

requirement of the Title VII analysis that similarly situated comparators must be outside the plaintiff's protected class.  *See, e.g., Wilson*, 376 F.3d at 1087 ("A plaintiff establishes a *prima facie* case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with ***similarly situated employees outside the protected class*.") (emphasis added); *Horn v. United Parcel Services, Inc.*, 433 Fed.Appx. 788, (11th Cir. July 7, 2011) ("The plaintiff must also point to someone similarly situated (***but outside the protected class***) who disputed a violation of the rule and who was, in fact, treated better.") (emphasis added and citation omitted).  Kennedy is not; therefore, she is an inappropriate comparator.

The second purported comparator identified by Johnson is a Caucasian RN named Jason Thompson.  It is undisputed that Thompson had amassed multiple violations (known as "occurrences" in the parlance of defendant's policy) of the Mobile Infirmary time and attendance rules,[17] for which Willis-Turner issued him a written warning via Corrective Action Report dated January 3, 2013.  (Willis-Turner Aff., ¶ 3 & Exh. B.)  The timing and content of Thompson's warning shows that Mobile Infirmary treated him similarly to Johnson for what were, at that point, similar violations.  Recall that Johnson received a written warning from Willis-Turner for time and attendance violations on December 26, 2012.[18]  Johnson's warning was for a total of

----

could believe Johnson's obvious misstatement that Kennedy is Caucasian; therefore, plaintiff's account as to that "fact" is discarded for summary judgment purposes.  *See, e.g., Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) ("where an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible" and is not credited on summary judgment because it is "inherently incredible and could not support reasonable inferences sufficient to create an issue of fact") (citations omitted).

[17]     Such rules were embodied in Mobile Infirmary's "Absence, Tardiness and Time Keeping Policy" (doc. 57, Exh. C).  In relevant part, this policy classified each unscheduled absence, tardiness, or early departure as an "occurrence," and specified that certain disciplinary action should be taken for certain frequencies of occurrences within a rolling 12-month period.

[18]     Willis-Turner explains the timing of these Corrective Action Reports for both Johnson and Thompson by noting that she reviewed her subordinates' time and attendance (Continued)

five occurrences, while Thompson's was for a total of seven.  Up to that point, certainly, all appearances were that (a) Thompson was similarly situated to Johnson, but (b) Willis-Turner had treated both of them the same way.[19]

Viewing the evidence in the light most favorable to plaintiff, Thompson's and Johnson's paths diverged thereafter.  As to Johnson, the summary judgment record reflects that, within 16 days after she received her December 2012 written warning, Johnson accrued no fewer than six additional violations of the time and attendance policy (*i.e.*, she left work early on January 6, indicated that she could not report to work on January 7 and 8, arrived late for work on January 10 and 11, and left work early on January 11).  By contrast, Thompson did not accumulate a similar concentration of new violations of the time and attendance policy so soon after receiving his January 2013 Corrective Action Report.  Plaintiff's evidence is that Thompson called in on January 7, 2013 and clocked in late on February 6, 2013, but that he had no other violations until April 24, 2013.  (Johnson Decl., at 9-10.)  Indeed, Willis-Turner observed that Thompson's unscheduled absence attendance issues improved after his January 2013 warning.  (Willis-Turner Aff. II, ¶ 4.)  Johnson's did not.  Simply put, barely two weeks after Johnson received a written warning for time and attendance problems, she had accrued six more occurrences.  Meanwhile, some three months after Thompson received a written warning for time and attendance

---

records in late December 2012 and early January 2013, then meted out discipline as appropriate. (Willis-Turner Aff., ¶ 3.)

[19]       Plaintiff disputes this conclusion by stressing the difference between five and seven attendance violations, and the fact that Thompson had received a written warning in August 2012, while Johnson had received only a pair of oral warnings in 2009 and 2011.  (*See* doc. 64, at 7.)  As for the number of violations, Mobile Infirmary policy provided that four unscheduled absences / tardies within a rolling 12-month period were grounds for a verbal counseling, while six were grounds for a written warning.  (Doc. 57, Exh. C at 3.)  Presumably, plaintiff's argument is that she was below six occurrences while Thompson was above it, yet they both received written warnings in December 2012 / January 2013.  The flaw in plaintiff's reasoning lies in her failure to account for Mobile Infirmary's policy statement that "[p]atterns of absenteeism or tardiness will be addressed through the guidelines of the Performance and Corrective Action policy."  (*Id.*)  Plaintiff has not shown it to be a discriminatory or unreasonable application of that policy for Mobile Infirmary to treat Johnson's five occurrences plus two prior disciplinary events the same as Thompson's seven occurrences plus one prior disciplinary event.  Certainly, no inference of unlawful race discrimination is raised by this set of circumstances.

-18-

violations, he had accrued only two more occurrences.  These record facts confirm that Johnson

and Thompson are not "nearly identical" in the quality and quantity of misconduct; therefore,

Thompson is not a valid comparator for purposes of plaintiff's *prima facie* case.[20]

Johnson's third comparator is a white nurse named Faith Lawshe.  With regard to

Lawshe, plaintiff's disparate treatment argument is different than it was for Thompson.  Johnson

---

[20]      In arguing otherwise, plaintiff focuses on Thompson's attendance record
throughout 2013, insisting that Mobile Infirmary's failure to discipline Thompson for subsequent
occurrences in April, May and November 2013 violates Mobile Infirmary policy calling for
suspension or termination after 10 occurrences.  (Doc. 57, Exh. C, at 3.)  This argument is
unavailing for at least three independent reasons.  First, plaintiff overlooks policy language
reflecting that occurrences are counted "in a rolling 12 month period."  (*Id.*)  For purposes of
Mobile Infirmary's time and attendance policy, the absolute number of occurrences is irrelevant;
instead, the critical metric is the number of occurrences in the last 12 months.  Plaintiff makes no
showing that Thompson accrued 10 or more occurrences in a 12-month period.  (In Paragraph 14
of her Second Declaration, Johnson makes certain unsupported assumptions in arguing that all of
Thompson's occurrences took place after July 2012; however, her reasoning is opaque and
speculative, and appears devoid of either supporting facts or personal knowledge.)  Second,
plaintiff ignores the fact that Mobile Infirmary did impose further discipline on Thompson for
time and attendance issues later in 2013, in the form of a written warning dated June 6, 2013.
(Willis-Turner Aff. II, ¶ 4 & Exh. A.)  After the June 2013 warning, Thompson's attendance
again improved, rendering further discipline unnecessary.  (*Id.*)  Third, even if plaintiff had
shown that Thompson had 10 occurrences in a 12-month period, she identifies no facts or
circumstances raising an inference of racially disparate treatment.  Mobile Infirmary says that
Johnson was suspended in January 2013 because she incurred a barrage of time and attendance
violations in rapid succession almost immediately after receiving a written warning.  No such
pattern existed with respect to Thompson.  (Willis-Turner Aff. II, ¶ 4 ("[d]uring the time period
he was under my supervision, [Thompson] did not display the concentrated series of time and
attendance violations as exhibited by Ms. Johnson between" December 26, 2012 and January 11,
2013).)  While plaintiff may subjectively deem Thompson's conduct to be equally egregious to
her own, the fact is that the quantity and quality of their misconduct was nowhere close to
identical.  Johnson cannot substitute her own business judgment for Mobile Infirmary's, nor can
she reach a jury on a race discrimination theory by showing that Mobile Infirmary treated
differently situated employees differently.  *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321,
1326 n.17 (11th Cir. 2011) (where preferentially treated individual is not similarly situated to
plaintiff in all relevant respects, "the different application of workplace rules does not constitute
illegal discrimination") (citation omitted).  That is all she has accomplished here with respect to
purported comparator Thompson.  And even if Johnson had established that Mobile Infirmary
deviated from its time and attendance policy in dealing with Thompson, that fact alone would
not compel denial of defendant's summary judgment motion.  *See Mitchell v. USBI Co.*, 186 F.3d
1352, 1355-56 (11th Cir. 1999) ("Even assuming that USBI did deviate from its policy, this
deviation does not raise an inference of discrimination.  Standing alone, deviation from a
company policy does not demonstrate discriminatory animus.").

does not assert that Mobile Infirmary disciplined Lawshe differently for similar misconduct. Instead, Johnson claims disparate treatment vis a vis Lawshe as to Mobile Infirmary's scheduling policy, which provides, "If an employee calls in sick or absent for a scheduled rotation, the employee will be rescheduled for a make-up rotation or week-end shift." (Willis-Turner Aff., ¶ 5 & Exh. D.)  Similarly, Mobile Infirmary's daily staffing policy provides that "Weekend Call In's [*sic*] should be made up on or a shift that is deemed appropriate by the unit manager." (Willis-Turner Aff., ¶ 5 & Exh. E.)  Plaintiff's evidence is that Lawshe missed work for various reasons (such as family illness) in 2013, but was not required to make up those days.  (Johnson Decl., at 10-11.)  By contrast, Johnson was required to make up her absences when she called in on January 7 and 8, as Willis-Turner mandated that she make up those missed shifts on January 10 and 11.  Johnson attributes the difference in treatment to unlawful race discrimination.

Lawshe is not a similarly situated comparator to Johnson for purposes of Mobile Infirmary's shift make-up policies.[21]  The reason is simple:  Defendant's unrebutted evidence is that, while Mobile Infirmary's scheduling and make-up policies were generally applicable to nurses, Mobile Infirmary exempted Lawshe from those requirements because she "suffered a work injury in August 2012 and was working light duty under doctor's restrictions of hours and duties until August 2014," such that she was in a "special situation" with regard to scheduling. (Willis-Turner Aff., ¶ 5.)  Plaintiff does not explain (much less present evidence to establish) how Lawshe could have been similarly situated to Johnson in all relevant respects as of early

---

[21]     Even if Lawshe were a valid comparator (which she is not) as to application of Mobile Infirmary's make-up policies, Johnson's *prima facie* case would still fail because being required to make up a missed shift cannot reasonably be viewed as an "adverse employment action" that might be actionable under Title VII.  *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (actionable employer conduct must be "significant" rather than "trivial," and more is required than "petty slights or minor annoyances that often take place at work and that all employees experience"); *Davis v. Town of Lake Park Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) ("[T]o prove adverse employment action in a [discrimination] case …, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment."); *Jackson v. Hall County Government*, 518 Fed.Appx. 771, 773 (11th Cir. May 8, 2013) (concluding that "shift assignments were not materially adverse employment actions and, therefore, not a basis for a discrimination or retaliation claim," such that plaintiff's discrimination claims "based on his shift assignments fail as a matter of law"); *Foster v. Thomas County, Ga.*, 927 F. Supp.2d 1350, 1357 (M.D. Ga. 2013) (concluding that plaintiff's assignment to night shift for four months was not an "adverse employment action" for purposes of a Title VII *prima facie* case).

2013 for purposes of the shift make-up policy, when Mobile Infirmary had expressly excused Lawshe from that policy because of medical restrictions on her hours and duties. Plaintiff may well disagree with Mobile Infirmary's decision to exempt Lawshe from that policy for medical reasons.[22] Nonetheless, the fact remains that Johnson and Lawshe were not similarly situated in all relevant respects, such that Lawshe cannot be a valid comparator with regard to Johnson's claim that Mobile Infirmary discriminated against Johnson because of race by requiring her to make up shifts for which she had called in on January 7 and 8, 2013.[23]

In short, Johnson has failed to meet her burden of establishing a *prima facie* case of unlawful race discrimination by Mobile Infirmary with regard to enforcement of time and attendance policies, and the making up of missed shifts. Accordingly, defendant's Motion for Summary Judgment is due to be **granted** as to Count II.

---

[22]     Of course, an employee cannot succeed on a discrimination case by "simply quarreling with the wisdom of" an employer's decisions. *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). After all, "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions." *Id.* (citation and internal quotation marks omitted). They do not concern themselves with "how medieval a firm's practices" or "how mistaken the firm's managers" might be. *Id.*; *see also Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("it is not our role to second-guess the wisdom of an employer's business decisions – indeed the wisdom of them is irrelevant"); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair.").

[23]     Instead of sticking to her original claim in Count II (as pleaded in the Second Amended Complaint) that Mobile Infirmary discriminated against her "[b]y forcing Plaintiff to make up miss [*sic*] work days and not require [*sic*] the same of white employees who miss their regularly scheduled work days" (doc. 32, ¶ 31), Johnson devotes portions of her summary judgment briefing to arguing that Mobile Infirmary discriminated against her on the basis of race by not offering her light duty when it did so for white employees such as Lawshe. (*See* doc. 56, at 25; doc. 59, at 11; doc. 64, at 3.) It is improper for a plaintiff to attempt such a *de facto* amendment to her pleading via summary judgment brief. *See, e.g., GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012) ("It is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings."); *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). Even if this argument were properly made (which it is not), it would not enable Johnson to withstand the Rule 56 Motion as to Count II for the reasons specified in Section IV.G., *infra*, as to plaintiff's argument that Mobile Infirmary's failure to provide her light duty work was unlawful retaliation. The Court will not reproduce that analysis here.

### E.       Family and Medical Leave Act Interference Claim (Count III).

In Count III, Johnson charges Mobile Infirmary with unlawfully interfering with her right to take time off from work to care for a seriously ill child, in violation of the Family and Medical Leave Act.  Defendant moves for summary judgment on Count III for the stated reasons of (i) "Johnson's inability to establish that her son suffered from an FMLA-qualifying event," and (ii) "Johnson failed to apply for the FMLA despite her knowledge of the process."  (Doc. 43, at 20.)

The FMLA makes it illegal "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  Thus, "[a] Plaintiff claiming interference must demonstrate by a preponderance of the evidence that she was denied a benefit to which she was entitled."  *Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1274 (11th Cir. 2012) (citation omitted); *see also Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006) ("To establish an interference claim, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied.") (citation and internal quotation marks omitted).  "The employee need not allege that his employer intended to deny the benefit – the employer's motives are irrelevant."  *Hurlbert*, 439 F.3d at 1293 (citation and internal quotation marks omitted).

Under the FMLA, eligible employees are entitled to up to 12 workweeks of unpaid leave during a 12-month period "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition."  29 U.S.C. § 2612(a)(1)(C).  A "serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves … continuing treatment by a health care provider."  29 U.S.C. § 2611(11)(B).  The phrase "continuing treatment by a health care provider" is defined in the accompanying regulations as meaning "[a] period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves … [t]reatment two or more times, within 30 days of the first day of incapacity, … by a health care provider … or [t]reatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider."  29 C.F.R. § 825.102; *see also* 29 C.F.R. § 825.115(a)(1)-(2).  Thus, to qualify as a "serious health condition" involving "continuing treatment by a health care provider," the plaintiff must show (i) a period of incapacity of more than three full, consecutive

days, and (ii) either two or more events of in-person treatment by a health care provider within 30 days of the first day of incapacity, or one or more events of in-person treatment by a health care provider with a regimen of continuing treatment.

Defendant's first argument is that Count III fails as a matter of law because Johnson has not met her burden of showing that her son had a "serious health condition" as defined in the FMLA.  The Court disagrees.  Plaintiff's evidence is that her son fell ill on January 5, 2013; that she took him to a health care provider on January 6, 2013; that the health care provider issued a diagnosis of influenza, prescribed a regimen of continuing treatment (*i.e.*, prescription of Tamiflu to be administered for five days) and ordered her son to remain out of school until January 9, 2013; that her son became ill at school on January 11, 2013; that Johnson took him back to a medical care provider that day; and that the treating physician concluded that Johnson's son was still suffering from the flu, provided further treatment, directed that the Tamiflu regimen continue, and cleared the child to return to school on January 14, 2013.  Viewed in the light most favorable to plaintiff, this evidence demonstrates that Johnson's son endured a period of incapacity of more than three consecutive, full calendar days; that he received in-person treatment from a doctor on at least two occasions within 30 days of the onset of the incapacity; and that he subsequently had another period of incapacity relating to the same condition.  These facts support a reasonable inference that Johnson's son indeed suffered from a "serious health condition" (*i.e.*, an illness that involves continuing treatment by a health care provider) that qualified Johnson for FMLA leave to care for him during the week of January 6 to 11.[24]

---

[24]    Mobile Infirmary's position is that there is no evidence that Johnson's son's incapacitation lasted more than 72 consecutive hours.  (*See* doc. 43, at 18-19.)  Plaintiff's showing, however, is that her son became incapacitated by illness on January 5, that she took him to see a doctor on January 6, that the doctor kept him out of school until January 9 (*i.e.*, more than 72 hours after he first became incapacitated on January 5), that the subsequent episode in which Johnson's son became ill at school on January 11 was a continuation of the serious health condition for which he had previously been treated, that he received additional in-person medical treatment on January 11, and that the doctor kept him out of school until January 14. Taking this evidence in the light most favorable to Johnson, a reasonable fact finder could easily conclude that the prerequisites for an FMLA-covered "serious health condition" (*i.e.*, three full consecutive days of incapacity, plus two or more events of in-person treatment) are present here, and that Johnson's early departure from work on January 11 was also covered because her son had incurred a subsequent period of incapacity relating to the same condition.

Defendant's second argument for seeking summary judgment as to Count III is that Johnson "never mentioned FMLA coverage" and provided inadequate notice to Mobile Infirmary "that she needed to leave to address a qualifying leave."  (Doc. 43, at 19, doc. 62, at 12.)  The argument, apparently, is that Johnson's FMLA claims fail because she did not use the right buzzwords in requesting time off from work.  Applicable regulations specify that "[a]n employee giving notice of the need for FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice."  29 C.F.R. § 825.301(b).  That said, an employee "must explain the reasons for the needed leave so as to allow the employer to determine whether the leave qualifies under the Act."  29 C.F.R. § 825.301(b).  What is necessary is that the employee "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request."  29 C.F.R. § 825.303(b).  For unforeseeable leave, "an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case."  29 C.F.R. § 825.303(a).

Viewing the record in the light most favorable to plaintiff, Johnson did provide sufficient information to allow Mobile Infirmary to determine whether the leave qualified under the FMLA.  Johnson shows that she called her supervisor on January 5 and notified her that Johnson's son was ill and that she would need to take him to the doctor the next day.  Johnson's evidence is that she provided Mobile Infirmary with medical documentation for the January 6 doctor's visit, confirming the diagnosis of influenza, the ongoing treatment regimen of medication, and the doctor's orders that Johnson's son not return to school until January 9.  Johnson further presents evidence that she notified her supervisor on January 11 that Johnson's son had become violently ill at school, and that she needed to leave work to take him back to the doctor's office.  Plaintiff also provided Mobile Infirmary with medical documentation for the ensuing January 11 doctor's visit, confirming that this episode was a continuation of her son's influenza, that treatment was to continue with Tamiflu, and that Johnson's son was not cleared to return to school until January 14.  Taken in the aggregate, Johnson's oral communications to her supervisor and her two sets of medical documentation submitted to Mobile Infirmary provided adequate information to determine whether FMLA protections applied to Johnson's time away

from work between January 6 and January 11.  As such, summary judgment will not be entered in Mobile Infirmary's favor as to Count III on a theory of deficient notice.[25]

### F.     Family and Medical Leave Act Retaliation Claim (Count IV).

Count IV of the Amended Complaint is a claim for FMLA retaliation, predicated on Johnson's allegation that Mobile Infirmary took "punitive action against her due to her complaints." (Doc. 32, ¶ 33.)  By its terms, the FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" under the FMLA.  29 U.S.C. § 2615(a)(2).  The gravamen of Johnson's FMLA retaliation claim is that her "employer discriminated against her because she engaged in activity protected by the Act." *Pivac v. Component Services & Logistics, Inc.*, 570 Fed.Appx. 899, 902

---

[25]        In so concluding, the Court has considered and rejected Mobile Infirmary's three counterarguments.  First, Mobile Infirmary disputes whether Johnson ever provided it with the January 6 medical records.  Plaintiff's Declaration states that she did, which is dispositive of the issue for summary judgment purposes.  Of course, defendant remains free to argue the point at trial via countervailing testimony, and the Court expresses no opinion as to whether notice would or would not have been sufficient for FMLA purposes in the absence of the January 6 records.  Second, Mobile Infirmary tries to shift its FMLA burden to Johnson via statements such as "Plaintiff had applied for FMLA several times previously in her employment with MIMC, so she was aware of the procedure … In fact, Plaintiff never mentioned FMLA coverage …." (Doc. 62, at 12.)  As noted *supra*, the regulations specify that a plaintiff in Johnson's position need not use magic words or talismanic phrases, much less directly invoke FMLA rights, in order to trigger an employer's coverage obligation.  Stated differently, defendant identifies no legal principle under which it makes any difference that Johnson had previously applied for FMLA for other conditions, but that she never mentioned the FMLA in relation to her son's illness.  Either way, Mobile Infirmary's legal duty under the FMLA appears to be the same.  Again, defendant has made no legal showing otherwise.  Third, defendant points to the statement of its Director of Employee Relations, Randy Stembridge, who avers that after Johnson filed her EEOC charge in May 2013, raising the FMLA issue, Stembridge invited her to submit "additional information" to show that her absences were for an FMLA-qualifying reason, but that Johnson submitted nothing else. (Stembridge Aff., ¶ 6.)  Again, Johnson's evidence is that she had already provided Mobile Infirmary with all the medical documentation she had pertaining to both the January 6 and January 11 doctor's visits. (Johnson Decl., at 13-14.)  Defendant does not explain why it believed that information to be inadequate.  Moreover, Johnson's evidence is that Mobile Infirmary never told her what additional information it needed in order to process her FMLA leave, but instead Stembridge simply issued a cryptic solicitation for "additional information" without specifying what was missing or why Mobile Infirmary refused to credit her leave under the FMLA based on the materials she had already furnished. (*Id.*)  In short, Mobile Infirmary's arguments for dismissal of Count III are unpersuasive at the summary judgment stage, and do not alter or undermine the analysis set forth *supra*.

(11th Cir. July 1, 2014). "[T]o succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right." *Strickland v. Water Works and Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001). "When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, we apply the same burden-shifting framework established by the Supreme Court in *McDonnell Douglas*." *Id.* Defendant seeks summary judgment on Count IV on the grounds that plaintiff cannot establish a *prima facie* showing.

To state a *prima facie* case for FMLA retaliation, a plaintiff must show that: "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment decision; and (3) the decision was [causally] related to a protected activity." *Pereda*, 666 F.3d at 1275 (citations omitted). On summary judgment, plaintiff specifies that "[t]he adverse action Johnson complains of occurred on January 15, 2013, when she was suspended for her alleged unscheduled absence on January 11, 2013." (Doc. 56, at 31.) An obvious question is what FMLA-protected activity Johnson purports to have engaged in prior to January 15, 2013. Again, Count IV alleges that Mobile Infirmary took "punitive action against her due to her complaints." (Doc. 32, ¶ 33.) What FMLA-related "complaints" did Johnson make prior to January 15? By her own admission, "[t]he thought never crossed [Johnson's] mind that [she] was eligible for FMLA" when she called in to work on January 6 and left work early on January 11. (Johnson Decl., at 5.) If Johnson never gave a thought to the FMLA and never asked her employer for FMLA leave in January 2013, then how can Mobile Infirmary have intentionally discriminated against her for requesting FMLA leave (which she did not do) in January 2013? Plaintiff does not say. Logic and common sense dictate that if a plaintiff neither invoked the FMLA nor engaged in FMLA-related complaints prior to an adverse employment action, such adverse action cannot have been motivated by discriminatory animus against the plaintiff for attempting to secure FMLA protections. *See Strickland*, 239 F.3d at 1207-08 (dismissing FMLA retaliation claim where "nothing in Strickland's affidavits or the other materials before the court would permit a jury to find that [defendant] had notice that Strickland was invoking the protection of the FMLA when he left work that day" and "[a] decision maker cannot have been motivated to retaliate by something unknown to him") (citation omitted).

-26-

Stated differently, because Johnson never told Mobile Infirmary in January 2013 that she wanted FMLA leave, Mobile Infirmary could not have intentionally discriminated against her in January 2013 for making such a request.[26]  Nothing in the summary judgment record supports an inference that Mobile Infirmary knew Johnson was invoking FMLA rights in January 2013; therefore, Mobile Infirmary could not have intentionally retaliated against her for engaging in protected activity that neither it nor Johnson knew was happening.  Furthermore, the record in the light most favorable to plaintiff reflects that Mobile Infirmary suspended Johnson for violations of its time and attendance policy, not for requesting FMLA-qualifying leave.  There are no record facts from which a reasonable fact finder could conclude that Mobile Infirmary's stated reasons for suspending Johnson for two shifts in January 2015 (*i.e.*, numerous violations of the time and attendance policy in close temporal proximity) were pretextual, and that the real reason for the disciplinary action was Johnson's attempt to assert rights protected under the FMLA.[27]  For aught the record shows, Mobile Infirmary would have taken similar disciplinary action against any employee with Johnson's record of highly concentrated absenteeism, tardies, and early departures from work following closely on the heels of prior attendance-related

---

[26]     Again, the Second Amended Complaint frames Johnson's FMLA retaliation claim as being predicated on allegations that Mobile Infirmary took "punitive action against her due to her complaints."  (Doc. 32, ¶ 33.)  The trouble is that Johnson has come forward with no evidence that she engaged in FMLA-related complaints prior to the alleged "punitive action" (*i.e.*, her January 15 suspension).  To the extent that plaintiff may be attempting to refashion Count IV on the fly in the course of summary judgment briefing, such efforts are improper.  *See* footnote 23, *supra*.

[27]     To be clear, the Court is not making a legal conclusion that Mobile Infirmary was entitled to count Johnson's potentially FMLA-qualifying absences in imposing discipline against her in January 2015.  If those absences were protected, then that fact would go to Johnson's FMLA interference claim (Count III), not her FMLA retaliation claim (Count IV).  Again, FMLA retaliation claims require intentional retaliatory animus on the part of an employer because the plaintiff attempted to assert FMLA rights.  Plaintiff has offered no evidence that Mobile Infirmary was "out to get her" for invoking FMLA rights, or that it had any idea she was attempting to exercise such FMLA rights at the time it disciplined her.  Such knowledge and intent is irrelevant to Count III; however, it lies at the core of Count IV.  *See Strickland*, 239 F.3d at 1208 ("[T]o state a claim that his employer has interfered with a substantive FMLA right, a plaintiff need only demonstrate that he was entitled to but denied the right.  He does not have to allege that his employer intended to deny the right; the employer's motives are irrelevant.").  The paucity of evidence of knowledge or intent is fatal to the Count IV retaliation claim.

discipline, even if those occurrences were totally unrelated to the FMLA.  Therefore, plaintiff's FMLA retaliation claim fails as a matter of law.

In the absence of any evidence that Johnson invoked FMLA rights or engaged in FMLA-related complaints prior to the January 15, 2013 adverse action, much less any facts supporting an inference that Mobile Infirmary's discipline of Johnson amounted to intentional discrimination against her for engaging in such protected activity, Defendant's Motion for Summary Judgment is **granted** as to Count IV.[28]

### G.     Title VII Retaliation Claim (Count V).

Finally, in Count V, Johnson maintains that Mobile Infirmary retaliated against her in violation of Title VII and § 1981 "due to her complaints to management about the manner in which she was treated by her immediate supervisor."  (Doc. 32, ¶ 34.)  This claim is also governed by the *McDonnell Douglas* burden-shifting framework.

To establish a *prima facie* case of retaliation under Title VII, Johnson must show that "(1) [s]he engaged in a statutorily protected activity; (2) [s]he suffered an adverse employment action; and (3) [s]he established a causal link between the protected activity and the adverse action."  *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009); *see also Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008) ("To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events.") (citation omitted).

Plaintiff's summary judgment brief omits any legal discussion of Count V; therefore, it is unclear how she contends record facts suffice to meet her *prima facie* burden.[29]  From the

---

[28]     Curiously, plaintiff appears to concede this point in her summary judgment brief, the penultimate sentence of which reads as follows:  "In essence, the facts wholly fail to support the allegations in Johnson's Complaint that she suffered punitive action due to her efforts to attend to the serious medical needs of her son."  (Doc. 56, at 32.)

[29]     Johnson's failure to respond to the Motion for Summary Judgment as it relates to Count V is at her peril.  To be sure, "the district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, … but must ensure that the motion itself is supported by evidentiary materials."  *United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004).  It is also true, however, that "district courts cannot concoct or resurrect arguments neither made nor advanced by the parties."  *Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011); *see also* (Continued)

allegations of the Second Amended Complaint, Johnson contends that her statutorily protected activity consists of "her complaints to management about the manner in which she was being treated by her immediate supervisor." (Doc. 32, ¶ 34.) A generous reading of her summary judgment brief suggests that Johnson is relying on her letter to Willis-Turner and other Mobile Infirmary officials dated January 29, 2013 and recounting her need for religious accommodation. Indeed, plaintiff contends that the January 29 letter "was directly related to the attempt to force her to work on Friday, January 11," and that subsequent adverse treatment was "in retaliation for pushing the issue regarding her religious convictions." (Doc. 56, at 8-9.) The Court therefore assumes that the January 29 letter is the protected activity on which Count V rests.

With regard to the "adverse employment action" prong of her *prima facie* case, Johnson states that "her work hours was [*sic*] cut and she was denied light duty work following an on the job injury." (Doc. 56, at 9.) With regard to work hours, however, there is simply no evidence in the record to support plaintiff's allegation. At the time Johnson wrote the January 29 letter, her position was part-time RN. She was regularly scheduled to work two 12-hour shifts per week, for a total of 48 hours per two-week pay period. Uncontroverted record evidence confirms that Johnson was paid for at least 48 hours per pay period, and often far more, during the months following her January 29 letter, reaching levels of 101.40 hours for the May 31, 2013 pay period and 76.70 hours for the June 14, 2013 pay period, for example. (Stembridge Aff., ¶ 9 & Exh. K.) By the end of the year, Mobile Infirmary had transferred Johnson to a full-time RN job in which she was regularly scheduled to work 72 hours per pay period. (*Id.*, ¶ 10 & Exh. L.) In short, Mobile Infirmary's business records demonstrate that Johnson was consistently assigned to work, and was paid for, at least 48 hours per pay period after submitting her January 29 letter. As such, the record does not support a reasonable inference that Johnson received a cut in work

---

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based on the materials before it on summary judgment. … Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

hours after complaining about Willis-Turner's failure to accommodate her religious beliefs as to weekend scheduling.[30]

The other adverse employment action that Johnson maintains was retaliatory is that she "was denied light duty work following an on the job injury." (Johnson Decl., at 6.)  The immediate problem with this contention relates to timing.  By plaintiff's admission, her injury occurred in January 2014, and she was released to light duty sometime later.  (*Id.*)  Thus, the alleged denial of light duty happened more than one year after the protected activity cited by Johnson (*i.e.*, the letter of January 29, 2013).  Such a vast temporal gap is insufficient, by itself, to establish the causation element of a *prima facie* case of retaliation.  *See, e.g., Clark County School District v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be very close.") (citations and internal quotation  marks omitted); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (while burden of causation can be met by showing close temporal proximity, "[a]

---

[30]     To be sure, the Declaration of Monica Johnson states, without elaboration or explanation, as follows: "After receiving a letter from me and one from my Church, an accommodation was worked out, but my work hours was cut."  (Johnson Decl., at 6.)  Of course, a nonmovant's evidence is taken as true on summary judgment; however, there are limits to this principle.  *See, e.g., Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) ("conclusory allegations without specific supporting facts have no probative value") (citation omitted); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("Bald conclusions … do not create a genuine issue of material fact.").  Significantly, a plaintiff's testimony is properly discounted on summary judgment if "it is blatantly contradicted by the record."  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013).  Plaintiff's work hours are a matter of empirical fact, recorded in defendant's business records.  There has been no allegation or suggestion by Johnson that Mobile Infirmary's records of her hours worked are inaccurate.  Those records conclusively establish that Johnson's work hours remained at a minimum of 48 hours per pay period (and often much higher) in the months following her January 29 protected activity, culminating in a transfer in late 2013 to a job in which Johnson was regularly scheduled to work a minimum of 72 hours per pay period.  Plaintiff's unadorned, conclusory statement "my hours was cut" is directly refuted by unchallenged business records.  Eleventh Circuit precedent does not allow Johnson to create a genuine issue of material fact by virtue of a bald, conclusory statement that is blatantly contradicted by the record.  In short, on this record, no reasonable jury could conclude that Mobile Infirmary reduced Johnson's hours in the wake of her January 29 letter requesting religious accommodation.

three to four month disparity between the statutorily protected expression and the adverse employment action is not enough"). Adverse action taken more than a year after the fact suggests, by itself, no causation at all. Plaintiff identifies no other evidence or argument for satisfying her *prima facie* burden of showing a causal relation between Johnson's letter of January 29, 2013 requesting a religious accommodation and the alleged denial of light duty sometime after January 2014.[31]

There is also a more fundamental problem with Johnson's attempts to construct a Title VII retaliation claim from the alleged denial of light duty. Uncontroverted record evidence shows that the only time following her January 2014 injury (a wrist injury sustained when Johnson slipped on ice in defendant's parking lot) when Johnson ever asked Mobile Infirmary to accommodate her medical restrictions was in February 2014, at which time her doctor released her to work with a lifting restriction of 20 pounds. (Hybart Aff., ¶ 3; Willis-Turner Aff. II, ¶ 2.) It is undisputed that Mobile Infirmary accommodated that restriction, and returned Johnson to work; however, after two days, Johnson left work complaining of pain and did not attempt to return until being cleared for full duty by an independent medical examination on June 24, 2014, at which time Mobile Infirmary promptly restored her to full duty. (Hybart Aff., ¶¶ 3-4; Willis Turner Aff. II, ¶ 2.) Johnson submits no evidence that (i) she was ever again cleared by her treating physician for light-duty work after February 2014, (ii) she ever notified Mobile

---

[31] Perhaps Johnson might argue (although she has not) that the requisite causal link can be established by comparing her situation to that of comparator Faith Lawshe (who had not made complaints of failure to accommodate religious beliefs). Plaintiff's evidence is that Mobile Infirmary provided light-duty work to Lawshe. (Johnson Decl., at 6.) Lawshe injured her ankle in September 2012 and was returned to work by her physician with specific restrictions that Mobile Infirmary accommodated for some period of time. (Hybart Aff., ¶ 8.) Where plaintiff's reliance on Lawshe as a comparator breaks down is that Johnson presents no evidence that (i) she ever told Mobile Infirmary after February 2014 that she had been cleared for light duty, (ii) Mobile Infirmary could have accommodated whatever restrictions her treating physicians imposed at that time, or (iii) Mobile Infirmary refused to do so. As such, plaintiff has not shown that she was similarly situated to Lawshe (in terms of physical condition, medical release status, or requested accommodations), such that the difference in treatment might raise a retaliatory inference.

Infirmary of such clearance or provided documentation of same, or (iii) Mobile Infirmary could have accommodated the specific light-duty restrictions (whatever they might have been).[32]

The bottom line is this:  With respect to Count V (Title VII retaliation), all plaintiff has said is that Mobile Infirmary cut her hours and denied her light duty in retaliation for her January 2013 letter requesting religious accommodation.  There is no evidence that Johnson's hours were ever cut; to the contrary, payroll records confirm that Johnson consistently worked and was paid for at least (and often far more) than the 48 hours she was regularly scheduled to work each pay period, and Mobile Infirmary transferred her a position greatly increasing her scheduled work hours later in 2013.  There is no evidence that Mobile Infirmary ever denied a request by Johnson to return to work with medical restrictions under circumstances supporting a reasonable inference of retaliation.  Even if Johnson had presented evidence (which she has not) that Mobile Infirmary denied a proper light-duty request from her that it could reasonably have accommodated, such an event would have happened more than one year after the alleged protected activity, with no causal link other than Johnson's say-so.  That is simply not good enough.  Given the dearth of legal argument that Johnson has advanced as to Count V, the Court cannot and will not fill in the gaps for her.  Instead, the Court concludes that Johnson has not made out a *prima facie* case of Title VII / Section 1981 retaliation, nor has she otherwise come forward with record facts giving rise to a reasonable inference that Mobile Infirmary retaliated against her for requesting a religious accommodation.  Summary judgment is properly **granted** as to Count V.

---

[32]     In her Declaration, Johnson says that "my physician had released my [*sic*] for light duty well before August, but Willis-Turner refused to offer I [*sic*] light duty employment." (Johnson Decl., at 6.)  However, Johnson does not allege that she ever informed Mobile Infirmary of the light-duty release condition, does not indicate what her work restrictions were, and does not identify any facts or circumstances raising an inference that Mobile Infirmary could have accommodated her specific restrictions but did not.  She does not present any supporting medical documentation.  She does not identify time frame.  By all appearances, Johnson is referencing the February 2014 release to work with 20-lb. lifting restriction.  Yet Johnson does not dispute Mobile Infirmary's evidence that Johnson was in fact allowed to return to work with that restriction, but left two days later because of pain, after which her doctors never cleared her again until May 2014.  Nothing in these undisputed facts or circumstances raises an inference of retaliatory denial of light duty.

V.      **Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1.      Defendant's Motion to Strike (doc. 63) is **denied** in its entirety, except that it is **moot** with regard to the objection concerning statements attributed to Faith Lawshe on May 30, 2013;

2.      Defendant's Motion for Summary Judgment (doc. 42) is **granted in part**, and **denied in part**;

3.      The Motion for Summary Judgment is **granted** as to Counts I, II, IV and V, and all such causes of action are **dismissed with prejudice** on the ground that there are no genuine issues of material fact and defendant is entitled to entry of judgment in its favor as a matter of law;

4.      The Motion for Summary Judgment is **denied** as to Count III (FMLA interference); and

5.      This action remains set for Final Pretrial Conference on **April 14, 2015 at 2:00 p.m.**, with jury selection to follow on **May 5, 2015**.  To allow sufficient time to digest and apply this Order, the parties' deadline for filing their Joint Pretrial Document is **extended** to **Friday, April 10, 2015**.

DONE and ORDERED this 6th day of April, 2015.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE